**Patrick James JEFFRIES,
Petitioner–Appellee,**

v.

**Tana WOOD, Superintendent,
Respondent–Appellant.**

No. 95–99003.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 20, 1996.

Reargued and Resubmitted Nov. 20, 1996.

Decided May 12, 1997.

Paul D. Weisser, Attorney General's Office, Corrections Division, Olympia, Washington, for respondent-appellant.

Stephanie Ross, Point Roberts, Washington; Robert S. Mahler, MacDonald, Hoague & Bayless, Seattle, Washington; Thomas W. Hillier, II, Federal Public Defender, Seattle, Washington, for petitioner-appellee.

Before: HUG, Chief Judge, GOODWIN, SCHROEDER, FLETCHER, REINHARDT, BRUNETTI, KOZINSKI, T. G. NELSON, HAWKINS, TASHIMA and THOMAS, Circuit Judges.

Opinion by Judge THOMAS; Dissent by Judge KOZINSKI.

THOMAS, Circuit Judge:

This case requires us to consider the effect of two precepts designed to promote consistency and stability in development of the law: the doctrine of law of the case and the presumption against retroactive application of new statutes.

After carefully examining the application of these tenets to this case, we hold that a three-judge panel improperly applied the law of the case when it reversed its prior decision and reimposed a death sentence. However, we hold that law of the case requires only vacation of the death sentence and the convictions for aggravated first degree murder, not the underlying first degree murder convictions. We also hold that the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214, does not have retroactive effect so as to alter the judgment in this case.

## I. BACKGROUND

Patrick James Jeffries allegedly murdered and robbed Phillip and Inez Skiff in Port Angeles, Washington in 1983. Jeffries met the Skiffs while Jeffries was serving a twelve-year prison sentence in Canada for robbery. After his release from prison in January 1983, Jeffries went to live with the Skiffs at their home near Port Angeles, in violation of his parole terms.

On April 2, 1983, the Skiffs' bodies were found buried in shallow graves on their property. Each had been shot repeatedly with .22 caliber bullets, Philip seven times and Inez ten times.

Using the Skiffs' pickup truck, Jeffries left the Skiff property on March 22 or 23, taking with him the Skiffs' portable television, chain saw, placer gold and coins, and other personal property. Jeffries was arrested in Wenatchee on April 7, 1983.

A jury found Jeffries guilty of two counts of aggravated first degree murder under Wash.Rev.Code § 10.95.020 and issued a special verdict finding of two counts of aggravating circumstances permitting imposition of a death penalty, namely: (1) that the murders were committed to conceal the commission of a crime or to protect or conceal the identity

of the person committing the crime; and (2) that there was more than one victim and the murders were part of a common scheme or plan or the result of a single act by the defendant. At the penalty phase, the jury found insufficient mitigating circumstances to merit leniency. On November 7, 1983, Jeffries was sentenced to death.

By a 5–4 vote, the Washington Supreme Court affirmed Jeffries' conviction and sentence on direct appeal. *State v. Jeffries,* 105 Wash.2d 398, 717 P.2d 722 (en banc), *cert. denied,* 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 301 (1986). Jeffries filed three personal restraint petitions in state court, all of which the Washington Supreme Court denied. *State v. Jeffries,* 722 P.2d 99 (Wash. 1986); *Petition of Jeffries,* 110 Wash.2d 326, 752 P.2d 1338 (en banc), *cert. denied,* 488 U.S. 948, 109 S.Ct. 379, 102 L.Ed.2d 368 (1988); *Matter of Jeffries,* 114 Wash.2d 485, 789 P.2d 731 (1990) (en banc).

On July 2, 1990, Jeffries filed a petition for writ of habeas corpus with the U.S. District Court alleging, *inter alia,* that he was denied his right to a fair trial because one juror had informed other jurors that Jeffries was a convicted armed robber. The district court authorized discovery on several of Jeffries' claims, including his claim of jury misconduct, and held an evidentiary hearing. On September 5, 1991, the district court rejected each of Jeffries' claims and dismissed the habeas petition. *Jeffries v. Blodgett,* 771 F.Supp. 1520 (W.D.Wash.1991). The district court made no findings as to whether the jury misconduct had occurred because it determined that there was no reasonable possibility that the alleged misconduct, even if true, had affected the jury verdict. *Id.* at 1539.

On appeal, the three-judge panel initially upheld the district court's findings. *Jeffries v. Blodgett,* 974 F.2d 1179 (9th Cir.1992) (*"Jeffries I "*). The panel then granted Jeffries' motion for rehearing. On rehearing, the panel reversed its prior holding on the juror misconduct issue, finding that it conflicted with *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir.1988). *Jeffries v. Blodgett,* 988 F.2d 923 (9th Cir.1993) (*"Jeffries II "*). Defendant Blodgett requested rehearing, with suggestion for rehearing en banc. In *Jeffries v. Blodgett,* 5 F.3d 1180 (9th Cir.1993), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994) (*"Jeffries III "*), the panel denied the requested rehearing and amended *Jeffries II.* The court rejected the suggestion for rehearing en banc. *Jeffries III* held that the extrinsic information at issue "would have had a 'substantial and injurious effect or influence' on the verdict." *Id.* at 1191. The case was remanded to the district court "for further proceedings" on the question of juror misconduct in light of *Dickson. Id.* at 1198.

On remand, the district court found that the jury misconduct had occurred. The district court renewed its opinion that no prejudice resulted from the juror misconduct, but concluded that *Jeffries III* required a writ of habeas corpus to issue upon a finding of juror misconduct.

Defendant Wood, who replaced Blodgett as Washington's chief prison official, appealed. Under the death penalty procedures adopted for the Ninth Circuit, the same three-judge panel which decided *Jeffries I, II,* and *III* was assigned the appeal. *See* Rule 22–3(a)(3) of the Local Rules of the United States Court of Appeals for the Ninth Circuit. On appeal, the panel reversed its decision in *Jeffries III. Jeffries v. Wood,* 75 F.3d 491 (9th Cir.1996) (*"Jeffries IV"*). The panel decided it had read *Dickson* "too broadly" and that there was a "principled ground" for distinguishing cases in which improper communication came to the jury through an official external source from cases involving intra-juror communication. *Id.* at 494. The panel further concluded that law of the case did not prevent reversal of its prior decision because *Jeffries III* was " 'clearly erroneous and would work a manifest injustice.' " *Id.* (quoting *Leslie Salt Co. v. United States,* 55 F.3d 1388, 1393 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995)). Jeffries petitioned for rehearing, with suggestion for rehearing en banc. The suggestion for rehearing en banc was granted.

## II. LAW OF THE CASE

### A. General Considerations

■ Law of the case is a jurisprudential doctrine under which an appellate court does

not reconsider matters resolved on a prior appeal. "The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir.1996) (quotations omitted); *see Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir.) ("[U]nder the 'law of the case' doctrine one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case."), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979).

■ Law of the case rules are founded upon "the sound public policy that litigation must come to an end. An appellate court cannot efficiently perform its duty to provide expeditious justice to all if a question once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal." *Kimball*, 590 F.2d at 771 (quotations omitted). This doctrine also serves to maintain consistency. 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478 (1981).

■ Certainly, law of the case is a discretionary doctrine. "The doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Leslie Salt*, 55 F.3d at 1393 (quoting *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912)); *see also Merritt v. Mackey*, 932 F.2d 1317, 1320 (9th Cir.1991) ("The doctrine is discretionary, not mandatory."). That discretion, however, is not unfettered. "While courts have some discretion not to apply the doctrine of law of the case, that discretion is limited." *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir.) (internal citation omitted), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 661 (1993). The prior decision should be followed unless: " '(1) the decision

is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate,[1] or (3) substantially different evidence was adduced at a subsequent trial.'" *In re Rainbow*, 77 F.3d at 281 (quoting *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995)); *see Leslie Salt*, 55 F.3d at 1393; *Merritt*, 932 F.2d at 1320; *Kimball*, 590 F.2d at 771–72.

The *Jeffries IV* panel recognized that the law of the case was an important consideration in reexamining *Jeffries III*. However, *Jeffries IV* concluded that *Jeffries III* fit one of the exceptions to law of the case because the decision was "clearly erroneous and would work a manifest injustice." *Jeffries IV*, 75 F.3d at 494 (quotation omitted). We disagree and hold that the three-judge panel erred in not adhering to the law of the case, as set forth in *Jeffries III*.[2]

**B. The "Clearly Erroneous" Test**

To establish an exception to law of the case, Wood must show that *Jeffries III* was "clearly erroneous." It was not. In fact, we find no error at all in *Jeffries III*.

On collateral review, trial errors affecting constitutional rights are subject to a harmless error analysis. *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993); *Lee v. Marshall*, 42 F.3d 1296, 1298 (9th Cir.1994). Under the *Brecht* standard, a petitioner must show that the conduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S.Ct. at 1714 (quotation omitted). Where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error, the error is not harmless and relief should be granted. *O'Neal v.*

---

1. Intervening controlling authority includes changes in statutory as well as case law. *Cf. Thomas*, 983 F.2d at 155 (referring to an "intervening change in the law" as opposed to an "intervening change in controlling authority").

2. We agree with the panel that neither of the other two exceptions are at issue. Accordingly,

our discussion will be limited to the "clearly erroneous" exception to law of the case. Because we must consider the merits of the juror prejudice issue in deciding whether *Jeffries III* was clearly erroneous, this holding also constitutes a decision on the merits.

**1490**

*McAninch,* 513 U.S. 432, 435–36, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).

*Jeffries III* held that the introduction of prejudicial information to a juror violated a defendant's right to a fair trial regardless of whether the source of that information was internal (e.g., another juror) or external (e.g., a bailiff). *Jeffries IV* stated that *Jeffries III* was incorrect in that the source of the prejudicial information *did* matter: if the source were internal rather than external, no presumption of prejudice existed.[3] This distinction was new. No prior case in the circuit had so held.

■ Juror knowledge of a defendant's past criminal record has long been recognized to be prejudicial. *See United States v. Lewis,* 787 F.2d 1318, 1323 (9th Cir.1986) (observing that it is extremely difficult for jurors to ignore prior convictions when deciding guilt), *modified,* 798 F.2d 1250 (9th Cir.1986). The possible prejudice is even more likely when the past record is related to the crimes for which the defendant is on trial. *United States v. Bagley,* 772 F.2d 482, 488 (9th Cir. 1985) (observing "the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again"), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986); *United States v. Field,* 625 F.2d 862, 872 (9th Cir.1980) (noting that evidence of past convictions of similar offenses raises the specter of "he did it before, he could do it again").

■ Contrary to Wood's position, we find no defensible distinction to be made based solely on the *source* of the information. Rather, the appropriate focus should be on the nature of the information itself. The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial. *Turner v.*

*Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); *United States v. Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984). This requirement "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner,* 379 U.S. at 471, 85 S.Ct. at 549.

■ Under the Sixth Amendment, a criminal defendant has the right to confront those who testify against him or her and the right to conduct cross-examination. *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). When a juror communicates objective extrinsic facts regarding the defendant or the alleged crimes to other jurors, the juror becomes an unsworn witness within the meaning of the Confrontation Clause. *See United States v. Howard,* 506 F.2d 865, 866 (5th Cir.1975); *United States ex rel. Owen v. McMann,* 435 F.2d 813, 817 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971). That the unsworn testimony comes from a juror rather than a court official does not diminish the scope of a defendant's rights under the Sixth Amendment. *See Lawson v. Borg,* 60 F.3d 608, 612 (9th Cir.1995) (holding that a juror's communication about the defendant's reputation for violence deprived the defendant of his rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment).[4]

■ Jeffries III correctly determined that the extrinsic information alleged to have been imparted here, Jeffries' prior robbery conviction, was "especially harmful" given the jury's adoption of two special findings that supported the convictions for aggravated first degree murder and the imposition of the death sentences. *Jeffries III,* 5 F.3d at

3. "In our application of *Dickson v. Sullivan* to the petition for rehearing, we read that case too broadly. We failed to discern the significant difference between external contamination of a jury by officers of the court (*Dickson*) and internal misconduct by a fellow juror...." *Jeffries IV,* 75 F.3d at 494.

4. In reaching this conclusion we are in accord with almost every other circuit which has addressed the question. *See United States v. Swinton,* 75 F.3d 374 (8th Cir.1996); *United States v.*

*Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984); *United States v. Howard,* 506 F.2d 865, 866 (5th Cir.1975); *United States ex rel. Owen v. McMann,* 435 F.2d 813, 817 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971). *But see United States v. Bertoli,* 40 F.3d 1384, 1394 (3d Cir.1994) ("[I]ntra-jury communications pose a less serious threat to a defendant's right to an impartial trial than do extra-jury influences....").

1191.[5] The aggravating circumstances warranting the penalty of death were (1) that the murders were committed to conceal the commission of a crime or the identity of a person committing a crime, and (2) the murders were committed as part of a common scheme or plan. The only crime referenced at trial was the crime known in common parlance as robbery; the only "common scheme or plan" involved the commission of robbery.[6] Thus, the introduction of Jeffries' past robbery conviction to jurors was without question extremely prejudicial. *See Dickson,* 849 F.2d at 406.

■ We agree with *Jeffries III* that the communication by its nature was intrinsically prejudicial and necessarily had a substantial and injurious influence on the verdict. Wood argues to the contrary, contending that the jurors engaged in little discussion about the conviction; that the person who made the comment was promptly told by another juror that consideration of the conviction was not permitted; and that two jurors who heard the improper comment stated in affidavits that they did not consider the prior conviction in reaching the verdict. However, these facts do not overcome the inherent prejudice.

Jurors' testimony that extrinsic evidence is not harmful is not controlling. *United States v. Bolinger,* 837 F.2d 436, 440 (11th Cir.), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988). The effect of extrinsic prejudicial evidence on a juror's deliberation may be substantial even though it is not perceived by the juror and "a juror's good faith cannot counter this effect." *United States v. Williams,* 568 F.2d 464, 471 (5th Cir.1978) (footnote omitted). Here, at least two jurors had nearly the entire trial to contemplate the impermissible communication.

■ Various factors might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case and therefore that the extrinsic evidence did not substantially and injuriously affect the verdict. These factors include: whether the prejudicial statement was ambiguously phrased;[7] whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial;[8] whether a curative instruction was given or some other step taken to ameliorate the prejudice;[9] the trial context;[10] and

5. In order to reach a verdict of aggravated first degree murder, a jury must find the defendant guilty of first degree murder and find one of several defined aggravating circumstances to exist. Wash.Rev.Code § 10.95.020 (1983). If a jury convicts a defendant of aggravated first degree murder, there is a presumption of a life sentence without possibility of parole. If the jury finds that there are insufficient mitigating circumstances to merit leniency, the sentence is death. Wash.Rev.Code §§ 10.95.030 *et seq.* (1983).

6. "It is clear from the record that the State's argument was that the defendant killed the victims in order to steal their property." *State v. Jeffries,* 717 P.2d at 735. The prosecution also suggested that Jeffries murdered Inez Skiff after she had discovered that Jeffries killed her husband to prevent her from exposing Jeffries to the authorities. *See id.* at 741.

7. *Cf. Thompson v. Borg,* 74 F.3d 1571, 1576 (9th Cir.1996) (affirming finding of no prejudice in part because the juror's remark—"pleaded guilty at one time and changed it"—was "vague and awkwardly phrased"), *cert. denied,* ―― U.S. ――, 117 S.Ct. 227, 136 L.Ed.2d 159 (1996).

8. *Cf. Bagley,* 641 F.2d at 1241 (affirming finding of no prejudice where trial judge accurately in-

formed the jury that a government witness had not been immunized in part because the trial judge had not previously ruled the information inadmissible); *Lawson,* 60 F.3d at 613 (finding that introduction of extraneous evidence could not be deemed harmless where "[e]vidence introduced at trial concerning violent acts committed by Lawson was far from conclusive as to Lawson's intent to rob").

9. Although the efficacy of instructions to ignore a defendant's prior convictions is highly questionable, *see Bayramoglu v. Estelle,* 806 F.2d 880, 888 (9th Cir.1986) ("A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate."), the potential for prejudice is certainly undiminished when no curative instruction was given and when "the defendant was deprived of the opportunity to rebut the evidence, to discuss its significance in argument to the jury, or to take other steps to lessen its prejudicial impact," *Dickson,* 849 F.2d at 408.

10. This would include consideration of the *Bayramoglu* factors: (1) whether the material was actually received; (2) the length of time the information was available to the jury; (3) the extent to which the jurors discussed and consid-

whether the statement was insufficiently prejudicial given the issues and evidence in the case.

Having considered all of this, we conclude that the *Jeffries III* decision was not "clearly erroneous"—indeed that it was correct—and that the extrinsic material "had a substantial and injurious effect or influence in determining the jury's verdict." *Lee*, 42 F.3d at 1298 (quotation omitted).

## C. The "Manifest Injustice" Requirement

■ Wood also failed to meet the second prong of the "clearly erroneous" exception to law of the case because she did not demonstrate that a manifest injustice would result from the *Jeffries III* interpretation.

■ The existence of exceptional circumstances is required before finding a manifest injustice. *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1082 n. 19 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985); *See United States v. Miller*, 822 F.2d 828 (9th Cir.1987). At a minimum, the challenged decision should involve a significant inequity or the extinguishment of a right before being characterized as manifestly unjust.

Wood failed to establish that adherence to law of the case would result in a situation meeting this standard. None of the State of Washington's rights have been extinguished. Retrial and resentencing are available options on remand. Although in some cases the unavailability of witnesses or evidence might result in manifest injustice, the record is devoid of any such showing here. Neither in its briefing, nor at oral argument, was Wood able to make any factual showing of manifest injustice. Thus, we conclude that the panel erred in determining that *Jeffries III* was "clearly erroneous and would work a manifest injustice." *Jeffries IV*, 75 F.3d at 494 (quotation omitted).

## D. Impact of Law of the Case on the Jeffries IV Opinion

■ We are mindful of the danger of reducing law of the case to a set of categorical rules, mechanically applied. Law of the case is not a limitation on judicial power, but rather "a guide to discretion." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). It is not "a doctrine of inescapable application." *Ferreira v. Borja*, 93 F.3d 671, 674 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 972, 136 L.Ed.2d 856 (1997). Law of the case would certainly not prevent a panel from changing its decision pursuant to a proper motion for reconsideration or a petition for rehearing, for example. Given this and the fact that law of the case is not binding on an en banc court,[11] Wood contends we should ignore the issue and decide this case directly on the merits. Although we recognize the discretionary nature of the doctrine, the manner in which panels apply law of the case is an important consideration for en banc review. If, as Wood argues, a panel's discretion is completely unbounded, the coherence and stability of the canon's application largely disappear. Of particular importance in this context is how law of the case should be applied when subsequent panels have relied on the initial decision. In this instance, two Ninth Circuit panels have relied and expanded on *Jeffries III. See Lawson*, 60 F.3d at 612; *Thompson*, 74 F.3d at 1575 n. 1. When this occurs, a panel must be exceedingly careful in altering the law of its earlier opinion. Otherwise, intra-circuit conflict may arise, posing serious difficulties. Indeed, to reach its decision properly, the *Jeffries IV* panel would have had to reverse *Lawson*, which would be impermissible. Only an en banc panel may overturn existing Ninth Circuit precedent. *Murray v. Cable Nat'l Broadcasting Co.*, 86 F.3d 858, 860 (9th Cir.1996), *cert denied*, —— U.S. ——, 117

ered it; (4) whether the material was introduced before a verdict was reached; and (5) any other matters which may bear on the issue. *Bayramoglu*, 806 F.2d at 887.

11. *Watkins v. United States Army*, 875 F.2d 699, 704 n. 8 (9th Cir.1989) (en banc), *cert. denied*,

498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). Nor would law of the case bind the Supreme Court. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988).

S.Ct. 689, 136 L.Ed.2d 613 (1997).[12] Of additional significance is that further appellate review of *Jeffries III* was sought and denied prior to the panel's change of heart. The State's suggestion for en banc review of *Jeffries III* was rejected and its petition for a writ of certiorari by the United States Supreme Court was declined. *Blodgett v. Jeffries,* 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994).

Thus, even aside from the fact that the *Jeffries IV* panel erred on the merits of the prejudicial information question, it should not have exercised its discretion to depart from its prior decision given the reliance on the *Jeffries III* opinion by subsequent panels, the further appellate proceedings in *Jeffries III,* and the guidelines set forth in *Leslie Salt.* Accordingly, we withdraw the *Jeffries IV* opinion and further hold that the district court was correct in issuing a writ vacating the verdict for aggravated first degree murder and the sentence of death.

**E. The Underlying First Degree Murder Conviction**

■ One issue regarding application of law of the case remains: the underlying conviction for first degree murder. Under Washington law, a jury must find the defendant guilty of first degree murder before finding the defendant guilty of aggravated first degree murder. Wash.Rev.Code § 10.95.020 (1983). First degree murder is considered a lesser included offense of aggravated first degree murder. *See State v. Pirtle,* 127 Wash.2d 628, 904 P.2d 245, 263 (1995) (en banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996). In the guilt phase of Jeffries' trial, the jury was instructed on the elements of first degree murder.

■ *Jeffries III* addressed only the aggravated first degree murder convictions and death sentences.[13] *Jeffries III* did not hold

that the communication of extraneous information required the underlying conviction for first degree murder to be vacated. *Jeffries III* focused on the jury's special findings, which affected only the jury's decision to convict Jeffries of aggravated first degree murder and sentence him to death. *Jeffries III* decided that internal juror misconduct could be prejudicial in that context, vacated the grant of summary judgment on the issue, and remanded the case for further proceedings in the district court in light of *Dickson. Jeffries III,* 5 F.3d at 1198.

Jeffries' counsel acknowledged in a letter to the three-judge panel that strict application of law of the case under these circumstances might require sustaining the first degree murder conviction. Thus, to be true to our law of the case holding, we must reverse the portion of the district court's writ that vacates the underlying first degree murder conviction.

**III. THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT**

**A. Introduction**

On April 24, 1996, prior to the grant of rehearing in this case, the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("Act"), became law. Since then, the Second, Third, and Tenth Circuits have held that the Act cannot be applied retroactively to actions filed prior to the enactment date. *See Boria v. Keane,* 90 F.3d 36, 38 (2d Cir.1996); *Burkett v. Love,* 89 F.3d 135, 138 n. 2 (3d Cir.1996); *Edens v. Hannigan,* 87 F.3d 1109, 1112 n. 1 (10th Cir.1996). The Fifth, Seventh, and Eleventh Circuits have held that the Act applies to cases pending at the time of its enactment. *See Hunter v. United States,* 101 F.3d 1565, 1573 (11th Cir.1996); *Drinkard v. Johnson,* 97 F.3d 751, 766 (5th Cir.1996); *Lindh v. Murphy,* 96 F.3d 856, 867 (7th Cir.1996) (en

---

**12.** The dissent seems to acknowledge that this law of the circuit doctrine would preclude the *Jeffries IV* panel from contradicting the *Jeffries III* opinion, thus reaching the same result as the majority.

**13.** The district court apparently concluded that *Jeffries III* meant that a writ of habeas corpus

should issue as to the entire conviction if the district court found that the juror misconduct actually occurred. We disagree with this reading of *Jeffries III* and the district court's construction is not binding on us. *See Milgard Tempering, Inc. v. Selas Corp. of America,* 902 F.2d 703, 715 (9th Cir.1990).

**1494**

banc), *cert. granted,* — U.S. —, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997).

After receiving briefs and hearing oral argument on the Act's effect on this case, we announced our decision that the amendments to Chapter 153 of Title 28 of the United States Code contained in Title I of the Act do not apply to cases filed in the federal courts of this Circuit prior to the Act's effective date. *Jeffries v. Wood,* 103 F.3d 827 (9th Cir.1996) (en banc). We published our decision prior to issuing an opinion because of the number of pending cases which depended on resolution of this issue, promising to detail our rationale in this full opinion.[14]

**B. General Retroactive Effect of the Act**

The presumption against retroactive application of new laws "is deeply rooted in our jurisprudence and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) (footnote omitted). It is "an essential thread in the mantle of protection that the law affords the individual citizen." *Lynce v. Mathis,* — U.S. —, —, 117 S.Ct. 891, 895, 137 L.Ed.2d 63 (1997).

 To be sure, Congress has the power to enact legislation with retroactive effect so long as it comports with due process by passing constitutional muster under rational basis scrutiny. *Gray v. First Winthrop Corp.,* 989 F.2d 1564, 1570 (9th Cir. 1993). "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches[.]" *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984). However, because retroactive application of new laws disrupts settled expectations and actions taken in reliance on them, courts will not presume retroactive effect absent express statutory language. "Words in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot otherwise be satisfied." *United States v. Heth,* 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806).

Landgraf altered the legal landscape so that prospective application has unquestionably become the default rule. 511 U.S. at 272, 114 S.Ct. at 1501. It established a three-stage analytical process for assessing the potential retroactive application of a statute. The first *Landgraf* question is whether Congress has prescribed the statute's proper reach. *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505. To make this determination, we employ the ordinary tools of statutory interpretation. In doing so, we are informed, of course, by the presumption against retroactive application and the requirement that if Congress is to rebut the presumption it must state its intention in words "clear, strong, and imperative" such "that no other meaning can be annexed to them." *Heth,* 7 U.S. (3 Cranch) at 413.

If congressional intent cannot be divined from examination of the statute, the second *Landgraf* inquiry is whether the new statute would have retroactive effect (i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct or impose new duties with respect to transactions already completed). *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505. The third *Landgraf* stage is conclusory: if the new legislation would operate retroactively, then "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.* Because we find Congress expressed its intent in the statutory language, we need only reach the first stage of the *Landgraf* analysis.

At issue is Title I of the Act, which reforms federal habeas corpus law in two sig-

---

**14.** We recognize that the Supreme Court has granted a writ of certiorari in *Lindh.* Normally, we would have deferred submission until the Court had issued its opinion. However, we announced our decision prior to the grant of certiorari and the contours of our decision are now being litigated before this circuit. Thus, we believe the opinion should be issued, but acknowledge the potential impact of *Lindh.*

nificant ways. First, Title I amended existing statutory provisions contained in Chapter 153, Title 28 of the United States Code. Second, it added a new chapter, Chapter 154, to Title 28 which provided for new special habeas corpus procedures in capital cases. Jeffries' appeal involves the potential retroactive effect of the amendments to Chapter 153 contained in Title I.

 The first stage of the *Landgraf* analysis is to determine whether Congress has expressed its intent. In statutory interpretation, the starting point is always the language of the statute itself. *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1213 (9th Cir.1996). In constructing Title I, Congress left little doubt as to the respective effective dates. Section 107(c) provides that Chapter 154 applies to all pending cases.[15] However, in describing the temporal reach of Title I, Congress did not apply the same language to the amendments to Chapter 153. Thus, a plain reading of section 107(c), coupled with the normal presumption of prospectivity, leads to the conclusion that the Chapter 153 amendments do not apply to pending cases.

The structure of Chapter 154 contains further evidence of congressional purpose. Chapter 154 incorporates by reference several provisions of Chapter 153, incorporation which would be completely superfluous if Congress intended both chapters to apply to pending cases. *See, e.g.*, 28 U.S.C. § 2264(b). The absence of such a statutory interplay was a factor in *Landgraf*'s determination of whether Congress had made a purposeful decision as to an effective date for various provisions of the Civil Rights Act of 1991. 511 U.S. at 262–63, 114 S.Ct. at 1495–96.

The Act's direct legislative history also underscores the clarity of congressional design. Title I comprises what originally was separate and independent habeas corpus reform legislation, which passed the U.S. House of Representatives on February 8, 1995, as H.R. 729, 104th Cong. (1995). 141 Cong. Rec. H1434 (daily ed. February 8,

1995). After transmittal to the U.S. Senate, H.R. 729 was referred to the Senate Judiciary Committee where it was inserted in its entirety into S. 735, 104th Cong. (1995), the pending antiterrorism legislation. As passed by the House, H.R. 729 did not provide for an effective date for either the Chapter 153 revisions or the new Chapter 154 procedures. When H.R. 729 was substituted into S. 735, the Senate Judiciary Committee made one substantive change: the addition of section 107(c) containing the effective date for Chapter 154. *Compare* original S. 735, 141 Cong. Rec. S5803 (daily ed. April 27, 1995), *with* S. 735 as revised by Amendment 1199, 141 Cong. Rec. S7857–77 (daily ed. June 7, 1995). As amended, S. 735 passed the Senate on June 7, 1995. 141 Cong. Rec. S7857 (daily ed. June 7, 1995). The habeas provisions were adopted without alteration by the Conference Committee on April 15, 1996. 142 Cong. Rec. H3305–33 (daily ed. April 15, 1996). Title I was signed into law along with the remainder of the Act on April 24, 1996. These affirmative congressional acts stand in contrast to the legislative history of the Civil Rights Act of 1991 considered in *Landgraf* which led the Court to conclude "that legislators agreed to disagree about whether and to what extent the Act would apply to preenactment conduct." 511 U.S. at 263, 114 S.Ct. at 1496. In *Landgraf*, the history revealed "no evidence . . . that an agreement had been tacitly struck" and contained "little to suggest that Congress understood or intended the interplay" of the various provisions at issue. *Landgraf*, 511 U.S. at 262–63, 114 S.Ct. at 1495–96 (emphasis omitted).

In statutory construction, we presume Congress legislated with awareness of relevant judicial decisions. *Cannon v. University of Chicago*, 441 U.S. 677, 696–704, 99 S.Ct. 1946, 1957–61, 60 L.Ed.2d 560 (1979). Congress's deliberate choice to include a specific retroactive application provision for Chapter 154 but none for Chapter 153 should be given effect. If Congress had intended that the amendments to Chapter 153 apply to pending

---

**15.** The effective date for Title I was established in section 107(c) of the Act:

EFFECTIVE DATE.—Chapter 154 of title 28, United States Code (as added by subsection

(a)) shall apply to cases pending on or after the date of enactment of this Act.

cases, it would have stated so unequivocally. Congress did not do so, much less rebut the presumption against retroactive application of new laws with a clear statement to the contrary, and we are compelled to give force to that decision. Thus, we find congressional intent as to Title I's proper reach to be defined in section 107(c).

In so concluding, we respectfully differ with our colleagues in the Eleventh Circuit that Congress was silent on the subject of retroactivity, requiring examination under subsequent steps of the *Landgraf* analysis. *Hunter*, 101 F.3d at 1570; *see Drinkard*, 97 F.3d at 766. The explicit circumscription of an effective date for Title I in section 107(c), the interrelation of the amendments to Chapters 153 and 154 in the Act, and the distinct expression of Congressional intent through the direct legislative history, all indicate "a deliberate congressional choice with which the courts should not interfere." *Central Bank v. First Interstate Bank*, 511 U.S. 164, 184, 114 S.Ct. 1439, 1452, 128 L.Ed.2d 119 (1994).

We also respectfully disagree with our colleagues on the Seventh Circuit who have rejected the idea that congressional intent as to the Act's retroactivity can be determined. *Lindh*, 96 F.3d at 861–62. They reason that direct statutory construction of Title I depends on application of a negative inference argument, a doctrine they maintain was repudiated by the Supreme Court. *Id.; see Landgraf*, 511 U.S. at 259–60, 114 S.Ct. at 1494. This principle of statutory construction is also known as *expressio unius est exclusio alterius* (an express declaration as to one item requires the exclusion of others). The argument for its application concerning Title I of the Act is that because section 107(c) specifically prescribes that Chapter 154 apply to pending cases and the Act is silent as to the effective date of the Chapter 153 amendments, there is a negative infer-ence that the amendments to Chapter 153 do not apply to pending cases.

As we have demonstrated, one need not resort to negative inference to resolve this issue. Not only is the statutory language clear, but we find the direct legislative history persuasive—a factor not discussed in *Lindh, Drinkard,* or *Hunter*. However, the principle of *expressio unius est exclusio alterius* does add additional support to our conclusion.[16] In examining the potential application of negative inference, we are first constrained to note that *Landgraf* does not preclude the use of the analysis in a proper case. It merely rejected its application in the context of the Civil Rights Act of 1991. *Landgraf*, of course, involved precisely the opposite circumstance to the one at bar. In *Landgraf*, the plaintiff was attempting to employ a negative inference argument from unrelated isolated sections of the Civil Rights Act of 1991 to overcome the presumption *against* retroactive application—an argument appropriately rejected by the Court. In this instance, unlike *Landgraf*, a negative inference analysis reinforces the presumption. Thus, we are true to *Landgraf*'s holding that "prospectivity remains the appropriate default rule." *Id.* at 272, 114 S.Ct. at 1501.

Wood, following *Lindh*'s lead, argues we should leap over statutory analysis and conduct a judicial examination of retroactive effect any time Congress does not provide an effective date for a section. This troubling interpretation of *Landgraf* would arrogate to the judiciary the privilege of determining effective dates of statutory sections by fact-intensive speculation as to a statute's potential impact on past conduct. We do not read *Landgraf* to command that an act's retroactive effect should always be decided by the courts unless Congress specifies the effective date in each section of a statute. Indeed, this construction would frustrate *Landgraf*'s philosophy which "allocates to Congress re-

**16.** The Second Circuit relied upon negative inference to conclude that Congress did not intend the Act to apply to pending cases. As the court noted in *Boria v. Keane*, 90 F.3d 36, 38 (2d Cir.1996):

Against this background, we look to the new statute to see if Congress has indicated an intent for it to apply to pending cases. While Congress has spoken clearly in some portions of the new statute with respect to the application to pending cases, (examples omitted) in the context of non-capital habeas cases the statute's silence is striking. This silence, coupled with the presumption against retroactivity, leads us to hold that the new statute does not apply to this case.

sponsibility for fundamental policy judgments concerning the proper temporal reach of statutes." *Id.* at 273, 114 S.Ct. at 1501. Although appropriate in construction of some statutes, judicial analysis of retrospective effect as a means of determining effective date should be the exception, not the default rule. Rather, the intent of Congress should remain the focal point for statutory construction. Only if the courts are unable to determine congressional intent from examination of the statute and its history, as informed by *Landgraf*'s default rule of prospectivity and the presumption against retroactive application, should they engage in the type of individualized examination required by the subsequent stages of the *Landgraf* analysis.

Wood correctly points out that there are a number of provisions in other titles of the Act which have differing effective dates.[17] Wood maintains that the existence of other dates undermines any possible significance of a negative inference analysis and that we ought not attach too much significance to section 107(c). This reasoning ignores the fact that Title I originated as separate, independent legislation unrelated to other portions of the Act. *Landgraf* examined this very situation and concluded that Congress's temporal prescription as to discrete sections of an act is not controlling as to other independent sections of the same statute. *Landgraf*, 511 U.S. at 257–63, 114 S.Ct. at 1493–96. That aphorism is particularly apt here. The Act encompasses a wide variety of divergent subjects, from biological weapons to immigration reform.[18] Because of this, each title must be deconstructed separately. Title I is internally consistent, as would be expected of a title which originated as separate legislation, and its temporal reach discernible. Thus, the existence of other effective dates outside of Title I is of little significance.

Accordingly, we find the first stage of the *Landgraf* analysis conclusive and need not reach the subsequent stages of the examination. However, because Wood and some of our sister circuits have devoted substantial analysis to assessing the Act's potential retroactive effect, some scrutiny under the second *Landgraf* inquiry is warranted.

*Landgraf*'s second analytic step is determining whether the statute would have retroactive effect. To answer this, we "must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 269–70, 114 S.Ct. at 1499. In this case, we have already determined that under pre-Act law, Jeffries must be resentenced. Wood argues that the Act would preclude this result. Thus, under Wood's theory, if the Act is applied to Jeffries, he will be executed; if it does not, he will be resentenced. Even applying only our "sound instincts", as *Landgraf* suggests we should, execution would seem to be a "new legal consequence." *Id.* (internal quotation omitted). Surely, our judicial instincts tell us, if imposing civil compensatory damages is a "new legal consequence" under *Landgraf*, death by lethal injection must fit the category. When we go beyond our instincts to examine the theoretical underpinnings of the Act, we can discern why retroactive application is not only counter-intuitive, but legally improper. *Landgraf* again provides the analytical framework.

*Landgraf* identified three examples of laws which generally do not have retroactive effect: (1) those which authorize or affect the propriety of prospective relief; (2) those which confer or oust jurisdiction and (3) those which make changes to procedural rules. 511 U.S. at 273–75, 114 S.Ct. at 1501–02.

Legislation which operates *in futuro* by definition generally does not have retroactive implications. The classic example is injunctive relief which proscribes present and fu-

---

17. *See, e.g.*, sections 221(c), 401(f), 414(b), 440(f), 607, 732(e)(2), and 903(c).

18. The Act is divided into nine titles, namely: Title I (Habeas Corpus Reform); Title II (Justice for Victims); Title III (International Terrorism Prohibitions); Title IV (Terrorist and Criminal Alien Removal and Exclusion); Title V (Nuclear, Biological, and Chemical Weapons Restrictions); Title VI (Implementation of Plastic Explosives Convention); Title VII (Criminal Law Modifications to Counter Terrorism); Title VIII (Assistance to Law Enforcement) and Title IX (Miscellaneous).

ture conduct. *See, e.g., American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921) (holding that the Clayton Act's provisions on injunctive relief applied to pending cases). However, habeas corpus relief involves precisely the opposite circumstance. In a federal habeas proceeding, a state prisoner seeks to vitiate a prior state court decision. A federal court's habeas corpus power is to correct an invalid antecedent state conviction or sentence. Thus, federal habeas relief is inherently "quintessentially backward looking" under *Landgraf.* 511 U.S. at 282, 114 S.Ct. at 1506.

Similarly, Title I does not confer or oust federal jurisdiction. Jurisdictional statutes concern the power of the court, not the rights or obligations of the parties. 511 U.S. at 274, 114 S.Ct. at 1502. Section 440(a) of the Act, which removes federal jurisdiction over certain immigration matters, is a paradigmatic jurisdictional provision which we found applicable to pending cases in *Duldulao v. INS,* 90 F.3d 396, 399 (9th Cir.1996). By contrast, nothing in the amendments to 28 U.S.C. § 2254(d) which are at issue here "ousts" federal courts of jurisdiction. Rather, Title I dictates how federal courts should exercise their jurisdiction. The Act does not prohibit federal courts from entertaining petitions for writs of habeas corpus; it instructs that the writ "shall not be granted" unless certain criteria are satisfied. 110 Stat. at 1219. Thus, the amendments to Chapter 153 are not "jurisdictional" as that term is contemplated by *Landgraf.*

Finally, the amendments to Chapter 153 are not procedural. Statutes implicating venue are illustrative of procedural changes which do not have retroactive effect. *See, e.g., Ex parte Collett,* 337 U.S. 55, 69 S.Ct. 944, 93 L.Ed. 1207 (1949). As *Landgraf* notes, parties generally have a diminished reliance interest in procedural matters. 511 U.S. at 275, 114 S.Ct. at 1502. However, as *Landgraf* acknowledged, "the mere fact that a new rule is procedural does not mean that it applies to every pending case." 511 U.S. at 275, 114 S.Ct. at 1502 n. 29. Courts must look to the nature and posture of an individual case. *Id.*

The amendments to Chapter 153 implicate substantive as well as procedural issues. The Act limits the ability of federal courts to reexamine questions of law and mixed questions of law and fact. Historically, federal habeas courts have reviewed all questions of law and mixed questions of law and fact *de novo. Wright v. West,* 505 U.S. 277, 299–304, 112 S.Ct. 2482, 2494–97, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring). Under the amendments to Chapter 153, federal courts must restrict their legal analysis to whether the state decision was contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Act further restricts the scope of federal review of mixed questions of fact and law. 28 U.S.C. § 2254(e). *De novo* review is no longer appropriate; deference to the state court factual findings is. These statutory alterations fall within the very genre of intertwined procedural and substantive issues which compelled the *Landgraf* court to conclude that altering the right to a jury trial was not purely a procedural question. 511 U.S. at 280–81, 114 S.Ct. at 1505. Similarly, because substance and procedure are inextricably impacted by Title I, the amendments cannot be viewed as having purely procedural implications.

Thus, the amendments to Chapter 153 cannot be classified under the general *Landgraf* denomination of statutes which have no retroactive effect.

Wood also contends that the amendments to Chapter 153 cannot create "new legal consequences" because Title I only impacts "secondary" rather than "primary" conduct. Under Wood's argument, the criminal act is the "primary" conduct. Wood reasons that a criminal would be unlikely to rely on the availability of federal habeas relief in committing a crime or making tactical litigation decisions. Therefore, Wood argues, prisoners could not have relied upon the availability of federal habeas relief to their detriment, no "settled expectations" have been disturbed and there are no new legal consequences to the underlying conduct.

Taken to its logical conclusion, Wood's argument means that no change in federal habeas law could ever have retroactive effect. Indeed, other than a true *ex post facto* law criminalizing a previously legal act, no change in criminal law could ever have retroactive effect under Wood's theory. The fallacy in this reasoning is that, with the exception of actual innocence cases, federal courts never adjudicate guilt in state prisoner habeas proceedings. The "primary" conduct described by Wood is never at issue. Rather, federal habeas relief is dependent upon an unconstitutional state court adjudication. A state prisoner's right to federal habeas relief is created by the entry of an unconstitutional state court judgment subjecting the prisoner to incarceration or death. Thus, the "primary" conduct implicated by federal habeas procedure is the state court proceeding, not the underlying criminal act. The prisoner's "settled expectations" are thus created when the state has placed him or her in custody in violation of the Constitution. Modifying the remedies available to the state prisoner to the point of transforming the legal outcome must necessarily constitute a "new legal consequence" under *Landgraf.*

These are generic considerations which caution against general retroactive application of the amendments to Chapter 153. *Landgraf* commands that if this analytical stage is reached, courts must "evaluate each provision of the Act in light of ordinary judicial principles concerning the application of new rules to pending cases and preenactment conduct." 511 U.S. at 280, 114 S.Ct. at 1505. Because we are satisfied as to congressional intent, we have not engaged in the specific inquiry required in the second *Landgraf* analytical stage.

Given the complexity of the procedural aspects of Title I, requiring universal subsequent stage analysis would have the highly undesirable effect of forcing courts to conduct a separate inquiry in each case as to its particular procedural posture. Besides being an unnecessary and considerable expenditure of judicial resources, such a practice would result in conflicting determinations of whether the Act applies, depending upon the case. This kind of applicability potpourri cannot be

what Congress intended. As literally thousands of pending prisoner cases exist, such inquiry can only result in an unwieldy patchwork of decisions devoid of any overall coherence. Our sound judicial instincts and common sense dictate that justice and judicial economy are better served by applying the Act to cases filed after the enactment date. That result would avoid unnecessary judicial chaos, while fully implementing congressional will as to habeas petitions filed after the enactment date.

Because Congress has addressed the effective date of the relevant provisions of Title I, we conclude that the amendments to Chapter 153 of Title 28 of the United States Code contained in Title I of the Act do not apply to cases filed in the federal courts of this Circuit prior to the Act's effective date. Because Jeffries' habeas petition was filed prior to April 24, 1996, the Act does not apply to his case.

## C. Effect of the Act, if Applied, to Jeffries

The parties were requested to brief and argue the impact of the Act, if applied, to Jeffries. Although we need not reach this issue because of our determination that the Act does not apply, we have elected to do so in the interest of completely deciding the issues presented and avoiding any further delay should our retroactivity analysis be altered by the Supreme Court in its pending decision in *Lindh.*

The Act amends 28 U.S.C. § 2254(d) to provide that no habeas relief may be granted to a person in custody pursuant to a judgment of a state court unless the claimed error:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Act requires us to give great deference to the state court's factual findings. Newly amended section 2254(e)(1) states:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

■■■■ Our sister circuits have examined standards of review under the Act, and we find their conclusions persuasive. State court conclusions of law, addressed by section 2254(d)(1), should be examined *de novo. Lindh,* 96 F.3d at 869; *see Drinkard,* 97 F.3d at 768. State court findings of fact must be given deference unless "adjudication of the claim 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence [presented in the State court proceeding].'" *Drinkard,* 97 F.3d at 767 (quoting section 2254(d)(2)). Certainly, a state court factual determination is unreasonable if it is "so clearly incorrect that it would not be debatable among reasonable jurists." *Drinkard,* 97 F.3d at 769; *Moore v. Johnson,* 101 F.3d 1069, 1076 (5th Cir.1996). As to more debatable factual determinations, "the care with which the state court considered the subject" may be important. *Lindh,* 96 F.3d at 871. "[A] responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment." *Id.*

■■■ In this case, there is no debate about whether one of the Washington Supreme

Court's critical factual findings was correct. It unfortunately was not. The Washington Supreme Court denied relief on the juror misconduct issue because it found that the misconduct was not reported until over two and a half years after it occurred. *See State v. Jeffries,* 722 P.2d at 100–01 ("Over two and a half years passed between the trial and the time the alleged misconduct was discovered, indicating that the jurors involved did not believe the misconduct to be significant."). Clear and convincing evidence to the contrary of this finding exists: Jeffries submitted an affidavit to the trial court by juror Kathleen Sims dated November 16, 1983, mere days after the jury verdict. Jeffries listed this affidavit as part of his designated appellate record in his direct appeal. Thus, the true facts were part of the "evidence presented in the state court proceedings," as required by the Act.[19] Indeed, neither party disputes that the Washington Supreme Court factually erred on this pivotal point.[20] Because the linchpin of the court's reasoning depended upon a demonstrably erroneous factual finding, we must conclude that the Act would not prevent relief.

There is an additional reason why the Act would not preclude a federal habeas corpus remedy. In its 1986 decision, the Washington Supreme Court required Jeffries to show actual and substantial prejudice from the alleged juror misconduct. *Jeffries,* 722 P.2d at 100. This was error under the Supreme Court precedent in existence at the time. When the Washington Supreme Court made its decision, the Supreme Court was applying the harmless error standard found in *Chap-*

---

**19.** The critical evidence was timely presented to the state trial court in support of a motion for new trial and made a part of the record before the Washington Supreme Court. The dissent suggests that because Jeffries did not include the Sims affidavit in his personal restraint petition, the Act prevents us from considering it. However, the Act requires examining the "merits in State court proceedings" based on "evidence" presented in the "State court proceeding." 28 U.S.C. § 2254(d). The use of the plural indicates that we evaluate the state court proceedings in aggregate. Further, except in rare circumstances, "evidence" is presented to a trial court, not an appellate tribunal, adding additional support to our conclusion. A contrary interpretation would impose the impractical requirement that the voluminous trial court record be attached to each separate appellate petition in or-

der to be considered. The dissent's suggestion that defendants would conceal an error is unlikely given the risk of procedural default.

**20.** The court's error may be partly explained by Jeffries' submission of new affidavits bearing a later date and the sheer volume of Jeffries' brief (248 pages on direct appeal) without mention of Sims' 1983 affidavit. However, as we have noted, the crucial affidavit was timely presented to the state trial court and was part of the appellate record before the Washington Supreme Court. If this were a disputed fact which required interpretation, we would defer to our colleagues on the Washington Supreme Court. However, both parties agree this factual determination was incorrect. It was not "debatable among reasonable jurists." *Drinkard,* 97 F.3d at 769.

*man v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), to habeas cases. *See, e.g., Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Under *Chapman's* harmless error standard, "constitutional error ... casts on someone other than the person prejudiced by it a burden to show that it was harmless." 386 U.S. at 24, 87 S.Ct. at 828. The Washington Supreme Court erred in requiring Jeffries to shoulder the burden of proof on prejudice, contrary to clearly established federal law as determined by the Supreme Court.

Thus, because the Washington Supreme Court's decision was based on an unreasonable determination of facts in light of the evidence presented in the state court proceedings and was contrary to clearly established federal law, the Act if applied would not preclude the issuance of a writ of habeas corpus.[21]

## IV. JUDGMENT

The opinion in *Jeffries IV,* 75 F.3d 491 (1996), is withdrawn. The judgment of the district court, issuing the conditional writ of habeas corpus, is **AFFIRMED** in part, insofar as it applies to petitioner's convictions for aggravated first degree murder and his sentences of death, and **REVERSED** in part, insofar as it applies to the underlying verdicts and convictions of first degree murder. This matter is remanded to the district court for entry of an appropriate order for resentencing and further proceedings consistent with this opinion.

KOZINSKI, Circuit Judge, with whom Judges GOODWIN, BRUNETTI, T.G. NELSON and HAWKINS join, dissenting.

### I

If you listen closely, perhaps you too can hear what the majority hears: the sounds of silence. Congress said nothing about section 2254(d)'s temporal scope anywhere in Chapter 153 of Title I of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 1996 U.S.C.C.A.N. (110 Stat.) 1214. Under *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994), we must therefore inquire whether section 2254(d) has a retroactive effect; if it does not, it must be applied to pending cases. The majority struggles to avoid this inquiry because it leads to the inescapable conclusion that section 2254(d) applies to this case. *See, e.g., Drinkard v. Johnson,* 97 F.3d 751, 764–66 (5th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997); *Lindh v. Murphy,* 96 F.3d 856, 861–67 (7th Cir.1996) (en banc), *cert. granted,* — U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997). Thus, the majority must make the unusual argument that Congress expressed itself on the retroactivity question, even though it said nothing at all about it. This oxymoronic conclusion is wrong for two reasons. First, it's based on a misreading of *Landgraf.* Second, it's just not true; there's *no* evidence Congress intended anything.

### A

The cornerstone of the majority's argument is its assertion that "*Landgraf* altered the legal landscape so that prospective application has unquestionably become the default rule." Maj. op. at 1494. According to the majority, when Congress did not address the retroactivity question in passing Chapter 153, it did so with this default rule in mind, and thus meant to endorse prospective application only. But this is not what *Landgraf*

---

**21.** There are at least two further grounds for concluding that the Act would not preclude habeas relief in this case. The Act provides that an "application for a writ of habeas corpus shall not be granted" unless the new standards in the amended section 2254(d) are met. 110 Stat. at 1218–19. In this case, the district court issued the writ of habeas corpus over a year before the Act became law, and its decision was correct under the law in effect at that time. Because we are not considering whether to order the district court to issue a writ, but are merely affirming the prior issuance of the writ by the district court, the Act does not preclude relief. Moreover, the question before us was whether, under the law of the case doctrine, the panel acted properly in purporting to reverse its pre-Act decision. We have concluded it did not, and that its pre-Act decision was correct. We do not believe that the Act was intended to preclude a decision of this type and nothing in Title I would so indicate.

said, so it's hardly what Congress could have had in mind.[1]

In fact, *Landgraf* was designed to preclude this precise argument. In *Landgraf,* the Supreme Court confronted a perceived conflict between two judicially-created rules for interpreting statutes that do not specify a temporal reach: the presumption against retroactive application and the contrary presumption that each case is governed by the law in effect at the time of decision. *See* 511 U.S. at 264, 114 S.Ct. at 1496. Courts often broke this inferential equipoise by following one of the presumptions and ignoring the other, much like the majority does today. *Landgraf* tried to fix this problem by explaining that the presumptions apply to different types of laws, and thus don't really conflict. Courts must first figure out which kind of law is at issue, and then apply the appropriate presumption.

The key to understanding *Landgraf* therefore is grasping the difference between a "retroactive law" and, what our court has called, a "retrospective law." *See United States ex rel. Lindenthal v. General Dynamics Corp.,* 61 F.3d 1402, 1407–08 (9th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1319, 134 L.Ed.2d 472 (1996). Contrary to popular misconception, not all laws that apply to pending cases are "retroactive." *See Landgraf,* 511 U.S. at 269–70, 114 S.Ct. at 1499. Only a law that would have a "retroactive effect," i.e., that would impair substantive rights on which a party relied when it acted or that would upset settled expectations, is deemed retroactive. *General Dynamics,* 61 F.3d at 1407–08. Laws that have no "retroactive effect" when applied to pending cases are deemed, in our circuit, "retrospective" laws. *Id.* at 1408. The presumption against retroactive laws is only triggered by "the class of new statutes that would have genuinely 'retroactive' effect." *Landgraf,* 511 U.S. at 277, 114 S.Ct. at 1503. This makes not only semantic sense, but common

sense as well: Courts are leery of retroactive laws because they can be very unfair, so the presumption is triggered only when a "retroactive effect" is threatened. *Id.* at 272, 114 S.Ct. at 1500. If a statute has no retroactive effect, the opposite presumption kicks in: The law in effect at the time of decision applies, and thus retrospective laws are presumed to apply to pending cases. *Id.* at 277, 114 S.Ct. at 1503; *see also Bradley v. Richmond Sch. Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). As a result, before courts apply judicial default rules, they must determine whether a statute would have a retroactive effect. *See, e.g., General Dynamics,* 61 F.3d at 1407–08; *United States v. $814,254.76 in U.S. Currency,* 51 F.3d 207, 211–12 (9th Cir.1995).

So, does Section 2254(d) have a retroactive effect? The answer is plainly no. While we won't repeat the arguments made by the Eleventh, Fifth, and Seventh Circuits, *see Hunter v. United States,* 101 F.3d 1565, 1571–73 (11th Cir.1996) (en banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 1695, 137 L.Ed.2d 822 (1997); *Drinkard,* 97 F.3d at 766; *Lindh,* 96 F.3d at 863–68, we note that section 2254(d) is paradigmatic of laws lacking any retroactive effects. *Landgraf* singled out three types of laws that generally have no retroactive effect: laws that (1) "authorize[ ] or affect[ ] the propriety of prospective relief"; (2) "confer[ ] or oust[ ] jurisdiction"; and (3) make "[c]hanges in procedural rules." *Landgraf,* 511 U.S. at 273–75, 114 S.Ct. at 1501–02. Based on those categories, section 2254(d) scores a hat-trick: It's (1) a procedural change, (2) jurisdictional in nature, that (3) merely regulates the power of federal courts to grant prospective relief-a writ of habeas corpus. *See Lindh,* 96 F.3d at 863–68. The majority's arguments to the contrary are fully answered by *Lindh. Compare* maj. op. at 1497–99 *with Lindh,* 96 F.3d at 863–68. Were section 2254(d) to attach new legal consequences to past con-

---

1. The majority's claim that *Landgraf* announced a default rule of prospective application is based on a single sentence whose meaning the majority distorts by ripping it out of context. *Landgraf,* 511 U.S. at 272, 114 S.Ct. at 1500–01. On the very next page from the one on which the majority's key sentence appears, the Court declares: "Even absent specific legislative authorization,

application of new statutes passed after the events in suit is *unquestionably proper* in many situations." *Id.* at 273, 114 S.Ct. at 1501 (emphasis added). How can this be squared with the majority's claim that "prospective application has unquestionably become the default rule"? *See* Maj. op. at 1494.

duct, presumably Jeffries could point to something that *he* would have done differently had he known about those new consequences. *See Landgraf,* 511 U.S. at 282, 114 S.Ct. at 1506 (a law has a retroactive effect if it's "the type of legal change that would have an impact on private parties' planning"). Obviously, Jeffries hasn't argued that he killed the Skiffs relying on the state of federal habeas law as it existed before the 1996 Act. He also hasn't pointed to anything he would have done differently in litigating his claim in the state courts had he known federal habeas review would be curtailed; he presented this exact juror misconduct claim to the state courts. *See State v. Jeffries,* 722 P.2d 99, 100–01 (Wash.1986); *see also* Personal Restraint Petition, *Washington v. Jeffries,* No. 52323–1 (Wash. Dec.17, 1985). The majority seems to admit that there is nothing that Jeffries would have done differently when it states that "the primary conduct implicated by federal habeas procedure is the state court proceeding." Maj. op. 1499. But, in determining whether a law has a retroactive effect, petitioner must point to some aspect of *his* conduct that he undertook in reliance on the prior law.

The fact that applying section 2254(d) to Jeffries's case may alter the outcome to his detriment doesn't alone make it retroactive, as almost every change in law will have an outcome determinative effect-else why bother passing a law at all? *Compare Boria v. Keane,* 90 F.3d 36, 37 (2d Cir.) ("Assuming . . . that the new statute would require a different outcome, application of the new statute to these circumstances would be retroactive."), *petition for cert. filed,* 65 U.S.L.W. 3342 (Oct. 11, 1996) (No. 96–628) *with Landgraf,* 511 U.S. at 269, 114 S.Ct. at 1499 (a law doesn't have a retroactive effect "merely because it . . . upsets expectations based in prior law"). That the legal consequence at stake here is the death penalty

makes no difference, unless "our 'sound instincts' " tell us that death is also different when it comes to retroactivity jurisprudence. *But see* maj. op. at 1497–98.

We also note that the majority's retroactive effect argument is incompatible with two recent Supreme Court decisions. According to the majority, at the moment an unconstitutional state judgment is entered, a prisoner's right to habeas relief vests, and it would be unfair to take away this right because the law changed in the interim. *See* maj. op. at 1498. The majority therefore argues that the 1996 Act would have a retroactive effect if applied to cases where the state proceedings were completed before April 24, 1996. If the majority's argument is sound, then the Court committed a grievous error in *Felker v. Turpin,* —— U.S. ——, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), in which it applied the 1996 Act's bar on successive petitions to a petitioner whose state court proceedings were completed long before April 24, 1996. *See id.* at ——, 116 S.Ct. at 2336. Moreover, in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the Supreme Court rejected an argument similar to the majority's claim that a prisoner has "settled expectations" in the state-court judgment subjecting him to incarceration. *See* maj. op. 1498. In *Fretwell,* the Court held that "[a] federal habeas petitioner has no interest in the finality of the state-court judgment under which he is incarcerated." 506 U.S. at 373, 113 S.Ct. at 844–45.[2] Because section 2254(d) has no retroactive effect, it's presumed to apply to Jeffries's case. *See Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016.

Perhaps aware of the weakness of its argument that this is a retroactive law, the majority goes to great lengths in arguing that Congress expressly resolved the retroactivity question. *See* maj. op. at 1497 ("[W]e find the first stage of the *Landgraf* analysis con-

---

**2.** In *Fretwell,* petitioner had a colorable ineffective assistance of counsel claim based on precedent existing at the time his state proceedings were completed. *See Fretwell,* 506 U.S. at 367, 113 S.Ct. at 841. However, by the time his federal habeas proceedings got underway, the precedent had been overruled. *Id.* at 368, 113 S.Ct. at 841–42. Applying the intervening law, the Court rejected his ineffective assistance

claim. *Id.* at 373, 113 S.Ct. at 844–45. In doing so, the Court rejected the argument that applying the intervening precedent would be unfair because it would upset the petitioner's interest in habeas relief created upon entry of the final state-court judgment. *See id.* at 372–73, 113 S.Ct. at 844–45. We must reject the same argument here.

clusive and need not reach the subsequent stages of the examination."). But Congress said nothing about retroactivity here; the majority therefore comes up with a legal misnomer, the *express implied* statement. *See* maj. op. at 1494–97. How a statement can be both express and implied is beyond me, but the fact remains that Congress said nothing on the subject, and this is clearly insufficient under *Landgraf* to avoid the retroactive effect analysis; only an explicit statutory command will do:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has *expressly* prescribed the statute's proper reach.... When ... the statute contains no such *express* command, the court must determine whether the new statute would have retroactive effect....

511 U.S. at 280, 114 S.Ct. at 1505 (emphasis added).

Unlike the majority, we cannot read this requirement as being satisfied by anything short of a clear statement in the statute. Perhaps the majority's interpretation would be linguistically plausible if the Supreme Court had omitted the words "express" and "expressly" from this passage. Our responsibility then would be to determine whether Congress had prescribed the statute's temporal reach by using the normal means of statutory construction: canons, legislative history, inference. But Justice Stevens in-

serted the words "express" and "expressly" in the *Landgraf* opinion and they must be given some meaning. In our dictionary, the adjective "express" means "clearly indicated; explicit"-which in turn precludes the type of inferential analysis the majority engages in at length. Since the statute contains no express-*i.e.*, no explicit-temporal command, we must proceed to determine whether the statute has a retroactive effect.[3]

Assuming, however, that something short of an explicit statutory command will suffice to signal congressional intent regarding retroactivity, the evidence of congressional intent the majority cites is very thin. The majority rightly points out that Chapter 153's statutory companion-Chapter 154, which creates special "opt-in" capital habeas procedures-was made immediately applicable to pending cases by an express statutory command. Pub.L. No. 104–132, § 107(c), 1996 U.S.C.C.A.N. (110 Stat.) 1226. According to the majority, by explicitly making Chapter 154 retroactive but saying nothing about Chapter 153, Congress must have intended Chapter 153 to apply prospectively. Were we writing on a clean slate, this might be a pretty good argument. But *Landgraf* specifically rejected this sort of negative inference; in fact, our court made a very similar argument which the Court rejected. *See Estate of Reynolds v. Martin,* 985 F.2d 470, 474 (9th Cir.1993). We have little doubt it will do so again.[4]

**3.** The majority believes *Landgraf* can't have meant what it says because this would impose a big burden on courts: Anytime Congress doesn't explicitly provide a temporal provision, courts would have to inquire whether the statute has a retroactive effect. *See* maj. op. at 1496. We fail to see how the "retroactive effect" inquiry is any more burdensome than trying to figure out congressional intent in the absence of an explicit statutory command.

The majority also objects that courts will have to engage in a provision-by-provision "retroactive effect" analysis. Maj. op. at 1496. This may be undesirable, but it's precisely what *Landgraf* calls for. *See* 511 U.S. at 280, 114 S.Ct. at 1505 ("[T]here is no special reason to think that all the diverse provisions of the Act must be treated uniformly ... [so] courts should evaluate each provision of the Act in light of ordinary judicial principles concerning the application of new rules to pending cases and preenactment conduct."). In fact, the very next case after *Landgraf* in the United States Reports concerns

whether a different provision of the same law at issue in *Landgraf* is retroactive. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).

**4.** Actually, it *is* a bit odd that Congress inserted a temporal provision into Chapter 154, but didn't do the same in Chapter 153, but it's not *so* odd that we are left with the inescapable conclusion that Congress meant to attach any significance to the difference. Congress may have focused on Chapter 154's temporal scope but overlooked Chapter 153's because of a significant difference between the two chapters: Chapter 153 merely amends existing procedures while Chapter 154 creates a brand new habeas track. Congress may have assumed that the amendments to existing procedures would go into effect immediately, but wasn't so sure about the brand new procedures, especially since these new procedures were contingent on another event occurring in the future-a state qualifying as an "opt-in." *See* 28 U.S.C. § 2261 ("opt-in" state must provide

The majority makes much of the legislative history, which it claims supports its negative inference. But there's nothing in the legislative record on the question of Chapter 153's temporal scope. In comparison, *Landgraf* decided that the 1991 Civil Rights Act's legislative history, which was full of many conflicting opinions about whether the Act was intended to apply to pending cases, lacked a crucial ingredient to make the negative inference persuasive: any evidence that "an agreement had been tacitly struck." 511 U.S. at 262–63, 114 S.Ct. at 1495–96. We're at a loss to figure out how a completely barren record can reveal that "an agreement had been tacitly struck" as to Chapter 153's temporal scope.

The majority briefly cites the selective incorporation of 28 U.S.C. §§ 2254(a),(d) & (e) of Chapter 153 into Chapter 154 as evidence that Congress intended Chapter 153 to be prospective. *See* maj. op. at 1495; 28 U.S.C. § 2264(b).[5] The majority, however, never bothers to respond to Judge Easterbrook's well-reasoned explanation of this selective incorporation: that it was designed to specify "not 'when,' but 'which'" provisions of section 2254 would apply to opt-in cases. *See Lindh,* 96 F.3d at 862; *see also Hunter,* 101 F.3d at 1570 n. 3. Petitioner attempts to counter Judge Easterbrook's argument by pointing out that it would mean the exhaustion rules in opt-in cases would be different from those in traditional habeas proceedings: sections 2254(b) & (c) (the traditional exhaustion rules) weren't among those provisions incorporated into Chapter 154. The answer, it seems to me, is that Congress made a deliberate choice to create new and different exhaustion rules for opt-in cases, *see* 28 U.S.C. § 2264(a), and we must respect that decision. That may put states at a disadvantage in some cases, *see id.* § 2264(a)(3), but that may be a price Congress intended states to pay in return for an expedited process.

## B

Applying section 2254(d) to Jeffries's case, it's clear we cannot second guess the Washington Supreme Court's adjudication of the juror misconduct claim. That court resolved the claim on the merits, applied the correct law and reasonably applied the law to the facts before it. *See* 28 U.S.C. § 2254(d). The majority asserts the authority to disregard the Washington Supreme Court's opinion because that court allegedly applied the wrong harmless error standard and relied on an erroneous fact. According to the majority, these mistakes strip the opinion of the protection granted by section 2254(d)'s deferential standard of review. Ironically, this holding is itself based on serious factual and legal errors.

The factual error: The majority chastises the Washington Supreme Court for failing to apply the *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), harmless error standard on collateral review. *See* maj. op. at 1500–01. Citing *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the majority claims that *Chapman* was the clearly established collateral review standard as announced by the United States Supreme Court in 1986, the time of the Washington Supreme Court's decision. Although *Rose* was a habeas case, and the opinion does refer to the *Chapman* standard, *id.* at 576, 106 S.Ct. at 3105, the Court in *Rose* did not establish the correct harmless error standard for collateral review. How do we know? The Supreme Court told us so in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993): "Although we have applied the *Chapman* standard in a handful of federal habeas cases, *see, e.g.,* ... *Rose v. Clark,* 478 U.S. 570[, 106 S.Ct. 3101, 92 L.Ed.2d 460] (1986) ..., we have yet squarely to address its applicability

---

competent post-conviction counsel to defendants); *Leavitt v. Arave,* 927 F.Supp. 394, 398 (D.Idaho 1996) (Chapter 154 needed an effective date provision to prevent the inference from the opt-in requirements that it only applied to future cases).

5. The argument seems to be that this incorporation would have been superfluous-another sec-

tion of Chapter 154 already declares that section 2254 will apply to opt-in cases-unless it was intended to make the retroactivity provision in Chapter 154 apply to sub-sections 2254(a),(d) and (e) when used in opt-in cases. This would only be necessary if section 2254 wasn't retroactive already, which could only be true if Chapter 153 weren't retroactive.

on collateral review." *Id.* at 630, 113 S.Ct. at 1718 (citations omitted). Although ahead of its time, the Washington Supreme Court actually applied the correct harmless error standard. *Compare Brecht,* 507 U.S. at 637, 113 S.Ct. at 1721–22 (habeas petitioner must show "substantial and injurious effect," i.e., "actual prejudice") *with Jeffries,* 722 P.2d at 100 ("petitioner must show 'actual and substantial prejudice' ").

The legal error: Section 2254(d)(2) provides that federal courts need give no deference to a state court adjudication "that was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding.*" 28 U.S.C. § 2254(d)(2) (emphasis added). Significantly, section 2254(d)(2) doesn't require that the state court discover the ultimate truth; rather it requires the state court to do its best given the information in the record before it.

Here, the Washington Supreme Court's observation that "[o]ver two and a half years passed between the trial and the time the alleged misconduct was discovered" reflected the evidence presented in Jeffries's collateral proceeding. *See Jeffries,* 722 P.2d at 100. In fact, it appears to be based on Jeffries's own assertion:

> Mr. Tyszko came forward later after being troubled by his conscience. Until he did these issues were hidden from everybody.

Reply Brief to Personal Restraint Petition, *Washington v. Jeffries,* No. 52323–1, at 7 n. 1 (Wash. Mar.3, 1986). Earlier in the same brief, Jeffries states that Tyszko "came forward almost two years later and told defense

counsel what happened." *Id.* at 4.[6] It's therefore not surprising that the Washington Supreme Court based its ruling on the assumption that over two years passed before "the alleged misconduct was discovered." Even the dissenting justices had the same understanding of the facts. *See Jeffries,* 722 P.2d at 101 (Utter, J., dissenting) ("Two years [after Jeffries's trial], two jurors ... filed affidavits....").

Of course, we know now that this statement was incorrect, but the evidence to the contrary wasn't presented to the Washington Supreme Court when it was adjudicating the claim of juror misconduct. Kathleen Sims's November 16, 1983, affidavit wasn't part of the record in the collateral proceedings. As the majority notes, it was buried in the substantial record on direct appeal, where Jeffries hadn't raised the juror misconduct claim. *See* maj. op. at 1500 n. 20. This evidence therefore cannot be considered for purposes of section 2254(d)(2), which limits federal courts to evaluating a state court's factual determinations "in light of the evidence presented in the State court proceeding" in which "the claim" at issue was adjudicated. 28 U.S.C. § 2254(d)(2).[7]

The majority ignores this important limitation and, in so doing, threatens to render all of section 2254(d) a nullity.[8] Recall that section 2254(d)(2) creates an exception to the rule of deference established by section 2254(d). If the exception weren't narrowly limited, petitioners could easily circumvent section 2254(d) by planting factual errors in state court dispositions. This case is a per-

**6.** In fact, Jeffries attempted to raise this issue again in two subsequent personal restraint petitions, and his briefs filed in those cases also contain the same factual misstatement. *See* Personal Restraint Petition Reply Br., *In re Patrick James Jeffries,* No. 53397–1, at 7 (Apr. 30, 1987); Brief of Petitioner, Personal Restraint Petition, *In re Patrick James Jeffries,* No. 56153–2, at 23 (June 15, 1989). In both cases, the Washington Supreme Court refused to reconsider its earlier ruling.

**7.** We're confused by the majority's argument that use of the plural "proceedings" in the preamble to section 2254(d) makes some difference, especially since the applicable subsection clearly uses

the singular. *Compare* maj. op. at 1500 n. 19 *with* 28 U.S.C. § 2254(d)(2).

**8.** The majority seems to think we would require petitioners to file voluminous trial court records in every state appellate proceeding. *See* maj. op. 1500 n. 19. Not at all. It's not where the evidence is located that matters; Jeffries could have incorporated the Sims affidavit by reference. What matters is that he never brought the evidence to the court's attention; he never mentioned the Sims affidavit in any of his state appeals and misled the court by making contrary representations. Under such circumstances, a state court cannot then be said to have made an *"unreasonable* determination of the facts in light of the evidence presented."* 28 U.S.C. § 2254(d)(2) (emphasis added).

fect blueprint of how to do it. Not only was the Sims affidavit included in the record for a different proceeding than the one at issue here, but it was never mentioned in any of Jeffries's briefs before the Washington Supreme Court, in neither the direct nor collateral proceedings. *See* maj. op. at 1500 n. 20. And, as noted above, Jeffries himself planted the factual mistake in the minds of the Washington Supreme Court Justices. *See* p. 1506 *supra.* Moreover, once the Washington Supreme Court issued its opinion rejecting his personal restraint petition, Jeffries didn't move for rehearing in an attempt to alert the court to the mistake. If the Washington Supreme Court's treatment of this issue in light of petitioner's presentation is unreasonable, Congress surely wasted its time in passing section 2254(d)(2).[9]

\* \* \*

While the application of the 1996 Act ends this case for us, we go on to address the majority's arguments on the merits because they amount to a serious misapplication of various important jurisprudential doctrines.

## II

If the vague comments referring to Jeffries's prior conviction made in the juryroom were harmful in this case, there is *no* case where such an error could be harmless. The majority thus has created what in practice is a per se rule of reversal for cases where information adverse to the defendant is uttered by or to one of the jurors outside the courtroom. In doing so, the majority gives birth to a mutant breed of trial errors that are "inherently prejudicial" and thus indistinguishable from structural errors. This end-run around *Brecht v. Abrahamson* was at-

tempted once before in *Thompson v. Borg,* 74 F.3d 1571, 1577 (9th Cir.) (Reinhardt, J., dissenting), *cert. denied,* —— U.S. ——, 117 S.Ct. 227, 136 L.Ed.2d 159 (1996), but was rebuffed. *See Thompson,* 74 F.3d at 1575 n. 1 (the dissent's reasoning is "contrary to the particularized case-by-case analysis of prejudice required by *Brecht* "). We should do the same here. Our failure to faithfully apply the *Brecht* standard will likely force the Supreme Court to send us another wake-up call. *Cf. California v. Roy,* —— U.S. ——, ——, 117 S.Ct. 337, 339, 136 L.Ed.2d 266 (1996) (9th Circuit applied the wrong harmless error standard by modifying *Brecht* ), *rev'g Roy v. Gomez,* 81 F.3d 863 (9th Cir. 1996) (en banc).

Of course, the majority can't announce its new creation out loud because a per se rule of reversal for non-structural errors would squarely contradict *Arizona v. Fulminante,* 499 U.S. 279, 307–10, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991), which holds that only structural errors merit automatic reversal on collateral review; any other error must be "quantitatively assessed in the context of other evidence presented in order to determine whether [it] was harmless...." *Id.* at 308, 111 S.Ct. at 1264. Instead, the majority reaches its goal through the back door by purporting to conduct a harmless error analysis. Sure, the majority enumerates a number of factors that could mitigate the harmful effect of the juror misconduct, but there's no evidence the majority actually considers them. All that seems to matter is that the information was "intrinsically prejudicial." *See* maj. op. at 1491.

A genuine harmless error analysis would lead the majority to the inescapable conclu-

---

**9.** The majority also claims that new section 2254(d) doesn't apply to Jeffries because the writ was granted before April 24, 1996. *See* maj. op. at 1501 n. 21. The majority seems to believe that new section 2254(d)'s standard of review applies only at the moment when the initial decision to issue the writ is made. The majority therefore argues that, "[b]ecause we are not considering whether to order the district court to issue a writ, but are merely affirming the prior issuance of the writ . . ., the Act does not preclude relief." *Id.* This argument proves too much: If it were true, courts of appeals would never be bound by

section 2254(d) in reviewing a district court's decision to grant the writ. Moreover, this argument ignores the traditional rule that a "complaint ha[s] no vested right in the decree of the District Court while it [is] subject to review." *American Steel Foundries v. Tri–City Council,* 257 U.S. 184, 201, 42 S.Ct. 72, 75, 66 L.Ed. 189 (1921). Moreover, the majority's claim that it's merely affirming the district court's grant of the writ is belied by the opinion's mandate, which reverses the grant of the writ as to the underlying first-degree murder conviction but orders its issuance as to the aggravated murder conviction and resentencing. *See* maj. op. at 1501.

sion that the extrinsic evidence here didn't have a substantial injurious impact on the verdict. *See Brecht*, 507 U.S. at 623, 113 S.Ct. at 1713–14. First, there was "overwhelming evidence" of Jeffries's guilt. *Jeffries*, 722 P.2d at 101; *see Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir.1990). The jury deliberations were lightning quick: Guilt phase deliberations took no more than ten hours;[10] penalty phase deliberations took five hours. Moreover, the extrinsic evidence was irrelevant as to one theory of aggravation. Recall that to convict Jeffries of aggravated murder, the jury had to find that he killed in order to conceal another crime. Wash.Rev.Code § 10.95.020(7) (1983). Evidence of Jeffries's prior robbery conviction might arguably have affected a finding that he murdered the Skiffs to conceal his robbery, but it couldn't possibly have affected the State's other theory, that Jeffries's killed Mrs. Skiff to prevent her from exposing Jeffries's earlier murder of her husband. *See State v. Jeffries*, 105 Wash.2d 398, 717 P.2d 722, 741 (1986); R.T. at 3503, 3514.

Second, the substance of the information communicated wasn't nearly as damaging as the majority claims. The district judge merely found that a juror stated something "to the effect that Jeffries either had a record or had been convicted of robbery." Order on Remand, *Jeffries v. Wood*, No. C90–925D, at 1–2 (Feb. 17, 1995).[11] This information was extremely vague, *see Thompson*, 74 F.3d at 1576, and related to a prior conviction of a very different sort than that charged–it's not very likely that jurors would conclude that, because a defendant had committed a robbery, he would be predisposed to commit murder, *see United States v. Field*, 625 F.2d 862, 872 (9th Cir.1980) ("[T]he conviction was not for a crime sufficiently similar to [the charged crime] to raise the spectre of 'he did it before, he could do it again.' ").

In fact, Jeffries's own actions belie the assertion that information regarding his criminal record was "intrinsically prejudicial." Although Jeffries tried to keep this information from the jury, he allowed one juror-the same juror who made the first misconduct allegations-to take a seat in the jury box even though she knew about his record. *See* Voir Dire of Kathleen Sims, Oct. 13, 1983, at 36–38. We must infer that Jeffries himself didn't think the information about his prior record was so "intrinsically prejudicial" that any exposure to it would automatically taint a juror's judgment.[12]

Third, the context in which the remark was made couldn't have been less damaging. We know this in part because no one is quite sure when and what was said: Seven of the ten jurors who gave statements couldn't remember any comment about Jeffries's record, one thought he had a recollection but suspected it might be imaginary, and the two that actually recall a comment gave vague and somewhat contradictory accounts. *See Jeffries*, 771 F.Supp. at 1538. Whatever was said apparently wasn't very memorable. At most, the district court found the remark made during the guilt phase was "made only in passing and was not repeated," "was neither considered nor dwelled upon by the

---

**10.** The record reflects that the jury began deliberating at 3:00 p.m. on November 4, 1983, adjourned for the night at 9:35 p.m., was ordered to return at 9:00 a.m. the next morning, and reached a verdict by 12:31 p.m. that afternoon.

**11.** The district court made two sets of factual findings. After the evidentiary hearing in 1991, the court determined the circumstances surrounding the making of the alleged "remark"- i.e., when, where and how it was made-but did not actually determine the substance of the remark. *See Jeffries v. Blodgett*, 771 F.Supp. 1520, 1539 (W.D.Wash.1991). *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir.1993) (*"Jeffries III"*), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994), remanded the case so the district court could determine the substance of the remark; the entirety of the district court's finding on remand is quoted in the text above. These findings will only be second-guessed if clearly erroneous. *See Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996).

**12.** By comparison, if Jeffries had confessed, but the confession had been suppressed-or if he had pleaded guilty, but withdrawn the plea-and a prospective juror said he knew about it, there's no doubt that Jeffries would have challenged the juror. The same would be true if Jeffries's prior conviction had been for an inflammatory crime, like child molestation. Instead, here Jeffries was willing to rely on Sims's promise not to consider the information; a promise all the jurors made.

jury," and was not made during the deliberations-the most critical time. *Id.* at 1539. There are even fewer details about the comment allegedly made during the penalty phase. *See id.* at 1538.

Fourth, it's hard to imagine more effective curative steps than were taken here. Not only did the trial judge instruct jurors "to disregard any evidence which . . . was not admitted," but it also appears the jurors themselves took steps to cure the error by immediately informing whoever made the comment about Jeffries's prior record that it wasn't supposed to be considered. *See Jeffries,* 771 F.Supp. at 1538.[13]

It's therefore understandable that the district judge, who held an evidentiary hearing and heard the jurors testify in person, *twice* concluded the error here was harmless. In 1991, the district judge concluded that "there is *no reasonable possibility* that the introduction of extrinsic evidence affected the jury verdict. . . ." *Id.* at 1539 (emphasis added). And upon remand from *Jeffries III,* the district judge in apparent exasperation declared:

> This Court remains convinced that there was no prejudicial error from statements by a juror as to Jeffries' past record or past conviction for armed robbery. However, this Court's review is tightly circumscribed by the Court of Appeals.

Order on Remand, at 2. Likewise, our colleague Judge Fernandez has insisted throughout this case's tortured history that the juror misconduct could only be described as harmful if one allows the nature of the information to "sweep[ ] away all other considerations." *Jeffries III,* 5 F.3d at 1198 (Fernandez, J., dissenting); *see also Jeffries v. Blodgett,* 988 F.2d 923, 929 (9th Cir.1993) (Fernandez, J., dissenting from order granting rehearing).

While in many cases judges can disagree in good faith about what constitutes harmless error under *Brecht,* there are other cases where there's only one reasonable conclusion;

this is surely such a case. The only way the majority can find this error harmful is to disregard *Brecht* by holding that a finding of actual prejudice isn't necessary: "[T]he communication by its nature was *intrinsically prejudicial* and necessarily had a substantial and injurious influence on the verdict." Maj. op. at 1491 (emphasis added). This holding disregards Supreme Court caselaw.

### III

We also disagree with the majority's application of the law of the case doctrine. The doctrine heretofore has been a somewhat benign discretionary rule which empowers courts to swat away unwelcome requests from disappointed litigants who pester them to reverse earlier rulings; it has never before been thought to prevent a court from reconsidering its own earlier ruling in a pending case when it decides it made a mistake.

Law of the case is a prudential doctrine; it's a courteous and efficient way for a court to say "enough's enough" when litigants seek reconsideration of prior interlocutory decisions. *See, e.g., Remington v. Central Pacific R.R. Co.,* 198 U.S. 95, 100, 25 S.Ct. 577, 579, 49 L.Ed. 959 (1905) ("However stringent may be the practice in refusing to reconsider what has been done, it still is but practice, not want of jurisdiction, that makes the rule."); *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."); *Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912) ("[L]aw of the case . . . merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."); *Russell v. Commissioner,* 678 F.2d 782, 785 (9th Cir.1982) (the law of the case is "a voluntary limitation"). Some such doctrine is necessary to help the court bring the case to a close where a party insists on coming up with new arguments. The law of the case doctrine thus enables the

---

**13.** For example, one juror gave the following account of the incident in the jury room:

> [One] of the jurors asked, "Didn't Jeffries have a record?" I remember saying, "I think so, but that has no bearing on this case." There

was general agreement. The discussion went no further at that time.

Affidavit of Kathleen Sims, Feb. 27, 1986, attached letter.

court to treat its own interlocutory rulings as final and go on with the business of deciding the rest of the case. *See Lockert v. United States Dept. of Labor,* 867 F.2d 513, 518 (9th Cir.1989) ("Law of the case doctrine is purely judge-made ... to help manage efficiently their own affairs."). This serves the interests of finality, efficiency and sound judicial administration. *See, e.g., United States Office of Personnel Management v. FLRA,* 905 F.2d 430, 434 (D.C.Cir.1990); *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 662 (5th Cir. 1974). These are very important interests, of course, but they can never stand in the way of a court's first duty-to decide the case right. *Loumar, Inc. v. Smith,* 698 F.2d 759, 762 (5th Cir.1983) ("The law of the case doctrine is not ... a barrier to correction of judicial error."). If, for whatever reason, a court develops doubts about one of its own interlocutory rulings, it need not weigh any factors or consider any countervailing considerations before it may reconsider its own questionable ruling. *See* 18 Charles Alan Wright et al., *Federal Practice and Procedure,* § 4478, at 789 (1981) ("Although courts are often eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish.").[14] The

court may-nay it must-go ahead and correct its own error, for no judicial sin is worse than issuing a judgment the judge knows to be wrong on the facts or law.

So what then of all those factors courts must consider in applying the law of the case doctrine-*e.g.,* whether there is intervening authority, whether the prior decision was clearly erroneous or would cause a manifest injustice, or whether substantially new evidence was revealed in the interim? *See, e.g., Leslie Salt Co. v. United States,* 55 F.3d 1388, 1393 (9th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995); *Hegler v. Borg,* 50 F.3d 1472, 1475 (9th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995); *Merritt v. Mackey,* 932 F.2d 1317, 1320 (9th Cir.1991); *United States v. Houser,* 804 F.2d 565, 568 (9th Cir.1986). Those factors matter only where the court would otherwise choose *not* to reconsider its own earlier ruling in reliance on the law of the case doctrine. If, for example, a litigant who lost a summary judgment motion comes up with an intervening Supreme Court or circuit opinion that goes the other way, a district judge would not have the unfettered discretion to not reconsider its erroneous ruling.[15]

---

**14.** *See, e.g., Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 602 (9th Cir.1991) ("[T]he law of the case is an equitable doctrine that should not be applied if it would be unfair."); *United States v. Miller,* 822 F.2d 828, 832 (9th Cir.1987) ("Law of the case should not be applied woodenly in a way inconsistent with substantial justice.").

**15.** We realize that there are opinions that characterize the law of the case doctrine somewhat differently. But the language they use doesn't appear to be particularly well-thought out. *See* Joan Steinman, *Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation,* 135 U.Pa.L.Rev. 595, 613 (1987) ("The Supreme Court has not considered the intricacies of law of the case doctrine at length or in decisions having broad precedential value."); *Miller,* 822 F.2d at 832 ("[T]he law of the case has been described by the Supreme Court as 'an amorphous concept.' " (quoting *Arizona v. California,* 460 U.S. at 618, 103 S.Ct. at 1391)).

*Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988), appears to be the one exception. After the Federal Circuit found that it lacked

jurisdiction over a case and transferred it to the Seventh Circuit, the Seventh Circuit reconsidered the jurisdictional issue, held that the Federal Circuit was "clearly wrong" and retransferred the case. The Supreme Court reversed the Seventh Circuit for failing to abide by the law of the case, suggesting that the law of the case should be strictly adhered to. *See id.* at 819, 108 S.Ct. at 2179.

But *Christianson* doesn't announce a general rule. Its seemingly strict version of the law of the case was motivated by unique policy considerations: The Court wanted to prevent jurisdictional ping-pong-*i.e.,* to prevent cases from being perpetually bounced back and forth between courts that disagreed over jurisdictional questions, which the Court considered inherently subject to disagreement. *See id.* at 818–19, 108 S.Ct. at 2178–79. Thus, the Court carved out a special rule. In defining the law of the case as applied generally, the Court used terms consistent with our view:

"A court has the power to revisit prior decisions of its own or of a coordinate court in *any circumstance,* although as a rule courts should be loathe to do so in the absence of extraordinary circumstances...."

*Id.* at 817, 108 S.Ct. at 2178 (emphasis added).

The action of the panel in *Jeffries v. Wood,* 75 F.3d 491 (9th Cir.1996) ("*Jeffries IV* "), in reconsidering the *Jeffries III* harmless error ruling falls squarely within that prong of the law of the case doctrine which gives the court the authority to reconsider its own prior rulings. Insofar as the law of the case is concerned, then, *Jeffries IV* was wholly free to reconsider what it had said earlier. This does not mean, of course, that *Jeffries IV* was free to rewrite *Jeffries III,* which was a published opinion and therefore had become the law of the circuit. As the law of the circuit operates in our court, no three-judge panel may reconsider a rule of law embodied in a prior published opinion; that can only be done by the court sitting en banc. *See United States v. Gay,* 967 F.2d 322, 327 (9th Cir.1992) ("[O]ne three-judge panel of this court cannot reconsider or overrule the decision of a prior panel."); *see also Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477, 1479 (9th Cir.1987) ("A panel faced with [a conflict between precedent] must call for en banc review...."). The fact that it happens to be the same panel in the same case doesn't make a difference. Having issued a published opinion which became final-which other panels of this court and other courts of this circuit justifiably relied on-the *Jeffries* panel could no longer simply reverse its earlier ruling. It was bound just like every other panel-not because its earlier ruling was the law of the case but because it was the law of the circuit.[16]

16. To ensure that this mistake doesn't recur, we would hold that, whenever law of the case and law of the circuit problems arise in the same case, the law of the circuit principle supplants any law of the case considerations. *See United States v. 162.20 Acres of Land,* 733 F.2d 377, 379 (5th Cir.1984) ("In this circuit, however, the law-of-the-case doctrine is supplanted by our firm rule that one panel cannot disregard the precedent set by a prior panel even though it perceives error in the precedent."); *see also LaShawn A. v. Barry,* 69 F.3d 556, 571 (D.C.Cir.1995) (Randolph, J., dissenting) ("[I]n circuits such as ours, where both doctrines are at work, the more exacting law-of-the-circuit doctrine supplants the law-of-the-case doctrine when panels hear multiple appeals from a single case."), *vacated by* 87 F.3d 1389, 1395 (D.C.Cir.1996) (en banc), *petition for cert. filed,* 65 U.S.L.W. 3632 (Mar. 11, 1997) (No. 96–1433). Supplanting the law of the case with the law of the circuit not only eliminates the confusion engendered by this case, but also assures that the law of the circuit will remain an absolute rule. Once a panel publishes a disposition, it loses the power to reconsider the issue on a subsequent appeal; instead, it can only correct a mistake by calling *sua sponte* for en banc. Fortunately, such clear mistakes occur infrequently enough that our en banc resources should not be overly burdened. *See* 1B *Moore's Federal Practice* ¶ 0.404[4.–5], at II–25 n. 11 (1996).

Many circuits have confronted the issue but decided not to resolve it. *See, e.g., LaShawn A.,* 87 F.3d at 1395 ("Because the law-of-the-case doctrine alone precluded [reconsideration], we need not delve deeply into the interplay between the law-of-the-case and the law-of-the-circuit doctrines."); *Liberty Mut. Ins. v. Elgin Warehouse & Equip.,* 4 F.3d 567, 571 n. 7 (8th Cir. 1993) ("Arguably the en banc rule is incompatible with a subsequent panel deviating from the law of the case established by a prior panel decision.... However, ... we need not consider this issue ...."); *cf. Lacy v. Gardino,* 791 F.2d 980, 985 (1st Cir.1986) ("We need not decide, however, whether the two habeas petitions are the same or different cases requiring the application of either the law of the case doctrine or *stare decisis.*"). But the Fifth Circuit is a notable exception: It supplants the law of the case with law of the circuit, although there are some anomalous decisions. *Compare Missouri Pac. R.R. v. Railroad Comm'n,* 948 F.2d 179, 186 (5th Cir. 1991) ("We see no reason to reconsider our earlier decision.... [I]t is a 'well-known and longstanding rule of decision in this circuit that one panel cannot overrule another.'") *with Blair v. Sealift, Inc.,* 91 F.3d 755, 761 n. 26 (5th Cir.1996) (noting the "wrinkle" that prior decisions "could either be considered the law of the case *or* the application of a 'prior' panel decision, i.e., the binding precedent of this circuit" (emphasis in original)). The Third Circuit has similarly expressed some doubt whether a panel may depart from the law of the case even when a prior opinion was clearly erroneous, which is akin to enforcing the law of the circuit principle. *See Todd & Co. v. SEC,* 637 F.2d 154, 157 & n. 4 (3d Cir.1980).

Commentators are divided on how to resolve this issue. Although noting that the relationship between the law of the case and the law of the circuit "is not altogether clear," Professor Moore appears to endorse supplanting the law of the case with the law of the circuit. *See* 1B *Moore's Federal Practice* ¶ 0.404[4.–5], at II–25 & n. 11. Professor Wright, however, appears to disagree: "Whatever may be said of the need to bind all succeeding panels to the stare decisis effect of a circuit decision in separate litigation, [the law of the circuit] rule should not be followed on successive appeals in the same case." *See* 18 Wright, *Federal Practice and Procedure* § 4478, at 692 n. 25 (Supp.1996) (discussing *Missouri Pac. R.R.,* 948 F.2d at 186).

The majority conflates the two concepts, to the detriment of both. On the one hand, it applies law of the case to prevent a court from correcting its * own erroneous ruling and, as we explain below, with disastrous consequences for petitioner. On the other hand, the majority weakens the law of the circuit doctrine by holding that a panel does, in fact, have discretion to overrule its own published opinions, so long as the law of the case balancing is satisfied. *See* maj. op. at 1492 ("When [subsequent panels rely on the initial decision], a panel must be exceedingly careful in altering the law of its earlier [published] opinion."). This is a power we have never before granted to a single panel of the court and it's a troubling weakening of the rule that only an en banc court may overrule published circuit precedent.

But it is the other aspect of the majority's holding that is the most troublesome-the rule that a court is bound by its own erroneous interlocutory ruling, even when it comes to the realization that it has made a big mistake. Is this just window dressing-a lot of fancy language that we can expect will be applied sensibly in the future? Not at all. The majority's application of this doctrine in our case is nothing short of procrustean.

The majority, it will be remembered, has concluded that the jury deliberations were impermissibly tainted because some of the jurors were aware of Jeffries's prior robbery conviction. On this basis it reverses petitioner's death sentence. But *precisely* the same analysis applies to Jeffries's murder conviction-only more so. While the jury might well have given Jeffries the death penalty even if it did not believe he had participated in the robbery,[17] commission of the robbery was at the heart of the prosecution's murder case.[18] It would seem to follow, therefore, that if the aggravated murder conviction was tainted, so was the underlying first-degree murder conviction.

The majority seems to concede as much but nonetheless leaves the murder conviction intact-and defendant subject to a sentence of life imprisonment. *See* Wash.Rev.Code § 9A.32.040. Why? Strange as it may seem, because this is "true to our law of the case holding." Maj. op. at 1493. If the law of the case doctrine precludes reconsideration of a first degree murder conviction we now know is tainted, we can't imagine the case where a panel is ever justified in defying the law of the case doctrine by reconsidering an earlier ruling.

Of course, we do not agree that either the sentence or the conviction was tainted, so we are not troubled about the substantive outcome of this part of the majority's ruling. But the majority's willingness to let stand a conviction that, by its own analysis, was unconstitutionally obtained-and let petitioner rot in prison for the rest of his life-just points out how powerful a doctrine law of the case is in the majority's mind. This lesson will not be lost on future panels, and on other courts in this circuit, when they consider going back to correct their own errors. The result will be a fair number of more erroneous rulings and useless appeals to correct mistakes that could have been taken care of by the court that made the error in the first place.[19]

---

**17.** The prosecution, it will be recalled, had two theories on which it sought the aggravated murder conviction: that Jeffries killed both victims to conceal the robbery and that he killed Mrs. Skiff to conceal his earlier killing of Mr. Skiff. *See Jeffries*, 717 P.2d at 741; R.T. at 3503, 3514.

**18.** The state introduced the robbery evidence to show Jeffries's motive and to tie him to the murders. The state introduced evidence that $30,000 in Canadian money was missing from the Skiffs' residence, that Jeffries was seen flashing large amounts of Canadian cash shortly after the murders, and that Jeffries sold or attempted to sell items stolen from the Skiffs shortly after the murders. *See Jeffries v. Blodgett*, 974 F.2d 1179, 1185 (9th Cir.1992). And, here's how the state explained Jeffries's motive: "[W]hy [did defendant murder the Skiffs]? Two reasons, one

for greed and the other for cover-up. The defendant wanted some property and he had to kill ... to get away with it." R.T. at 3503. Finally, the state argued that the murderer and robber were the same person: "I don't know what precipitated the killing, but [whoever did it] was greedy and [Jeffries's] Counsel admitted it. Whoever killed him, and I submit it was Jeffries, is greedy." R.T. at 3532.

**19.** We mention only in passing another curious aspect of the majority's holding. At one point, the majority concedes that the law of the case doctrine does not apply to an en banc court. *See* maj. op. at 1492. And, of course, it does not-any more than our errors are binding on the Supreme Court. *See Christianson*, 486 U.S. at 817, 108 S.Ct. at 2178. Yet the majority then goes on and applies law of the case anyway. Very strange indeed.